## VOLUME 144

## CASES ARGUED AND DECIDED IN THE SUPREME COURT OF LOUISIANA

AT TERM BEGINNING FIRST MONDAY OF OCTOBER, 1917
AND
AT TERM BEGINNING FIRST MONDAY OF OCTOBER, 1918

(80 South. 18)

No. 21206.

LAWRENCE et al. v. YOUNG.

(April 1, 1918. On Rehearing, Nov. 4, 1918.)

*(Syllabus by the Court.)*

1. DEEDS ⊚⟾109 — DESCRIPTION — PRESUMPTION.

A court will not presume, upon a strained interpretation of a description contained in a conveyance of real estate, that the grantor intended to convey property that belonged to another.

2. DEEDS ⊚⟾93 — CONVEYANCE — LAND NOT OWNED BY GRANTOR.

Persons who have lived the greater part or the whole of their lives, and have attained majority whilst living, upon land which forms the boundary, but a few hundreds of yards distant, of a town, may reasonably be supposed to act intelligently when they make a conveyance of a portion of their land as "next to" or "adjoining" the town, and not thereby to intend to convey land within the town, particularly land which does not belong to them.

3. ADVERSE POSSESSION ⊚⟾13—PRESCRIPTION OF TEN YEARS—REQUISITES.

In order to acquire immovable property by the prescription of 10 years, one must have actually possessed it in good faith during that period, in the capacity of owner, under a title which, if otherwise valid, would, by its terms, transfer the ownership, and which he had received from a person whom he honestly believed to have been the owner; and his possession must have been continuous, uninterrupted, peaceable, public, and unequivocal.

4. ADVERSE POSSESSION ⊚⟾84—PRESCRIPTION OF THIRTY YEARS—REQUISITES.

The possession required for the acquisition of immovable property by the prescription of 30 years is of the same character as that required in cases of the 10-year prescription, except as to the matter of title and good faith.

5. ADVERSE POSSESSION ⊚⟾84—PRESCRIPTION —"POSSESSOR IN GOOD FAITH."

A possessor in good faith is one who possesses as owner by virtue of an act sufficient

144 LA.—1

2

in terms to transfer the property, and of the defects of which he is ignorant.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Possessor in Good Faith.]

6. REAL ACTIONS ⊙⥱8(4, 5)—PETITORY ACTION—POSSESSOR IN BAD FAITH—LIABILITY FOR REVENUES.

A possessor in bad faith is liable to the owner for the fruits and revenues of the property during the period of his possession, and is not entitled to set off, as against the demand therefor, any claim based upon the enhanced value of the property, resulting from works which he may have put thereon, though he may recover the cost of the labor and material expended by him on such work "without regard for the greater or less value that the soil may have acquired thereby." But where he has expended nothing, he can recover nothing.

7. REAL ACTIONS ⊙⥱8(2)—PETITORY ACTION—RECOVERY OF RENTS—COUNTERCLAIM—BURDEN OF PROOF.

Where the plaintiff in a petitory action, held entitled to recover rents collected by defendant, proves the collection of a certain gross amount, and the defendant claims credits for expenses incurred in making the collection, the burden rests upon him to establish such credits (assuming that he would be entitled to be so credited) by sufficient evidence; mere guessing will not answer the purpose.

*(Additional Syllabus by Editorial Staff.)*

8. DEEDS ⊙⥱113—PROPERTY CONVEYED—DESCRIPTION—"MORE OR LESS."

The words "more or less," as used in a conveyance of real property, mean that the exact acreage called for may not be found, and provide against that contingency, so that the grantee shall take less, if the difference be small.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, More or Less.]

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Thomas M. Milling, Judge.

Petitory action by Robert B. Lawrence and others against Mrs. M. M. Young. Judgment for defendant, and plaintiffs appeal. Judgment annulled, and judgment rendered for plaintiffs as to title, rents, and interest.

Charles L. Wise, of Morgan City, and Borah & Himel, of Franklin, for appellants.

Foster, Milling, Saal & Milling, of New Orleans, for appellee.

### Statement of the Case.

MONROE, C. J. . Plaintiffs (Robert B. Lawrence and his sister, Mrs. Lydia Lawrence Eccles) bring this petitory action for the recovery of the triangular lot designated by the letters A, B, C on the subjoined sketch, which, by reason of the batture accretion, has increased in area, beyond that indicated by the sketch, from 1.7 to more than 6 acres.

They allege that the lot was originally acquired by their uncle, Robert B. Brashear, from Olympus Young, since deceased, husband of defendant, and that the batture was thereafter acquired at a sale, by order of court in the succession of Robert B. and Thomas T. Brashear, by petitioners' brother, Walter B. Lawrence, after whose death, and by reason of a partition and settlement between his heirs and the widow and heir of Robert B. Brashear, it devolved upon his heirs, and, at a later date, upon petitioners, as their sole survivors and heirs. They further allege that defendant has entered and trespassed upon the property, and they pray that she be cited, and that they have judgment therefor and for the revenues collected therefrom.

Defendant sets up title to certain land, which she alleges (and plaintiffs deny) includes the property in dispute, as having been acquired from her three stepdaughters, children and heirs of her deceased husband; alleges that she has been in undisturbed possession thereof, as owner in good faith, for more than 30 years, and pleads estoppel, and the prescriptions of 10, 20, and 30 years, as against the claim for the lot, and, even though the claim to the property be sustained, of 1, 3, 5, 10, 20, and 30 years as against the claim for the revenues; further alleges that she has caused work to be done which

"SKETCH"

MATTER REFERRED TO IN OPINION AS BEING "PAINTED WHITE" IS SHOWN SHADED IN SKETCH.

has enhanced the value of the property in an amount exceeding $3,000; and prays, in reconvention, that she have judgment therefor in the event of an adverse judgment on the questions of title and revenues. She further sets up pleas of prescription, as based upon certain transactions between herself and other parties, the relevancy of which we are unable to discover.

It appears from the evidence that on March 23, 1853, by act before Thomas A. Smith, notary, Robert B. Brashear purchased from America S. Brien, wife of Alfred Sterns, the triangular lot containing 12 acres, lying adjacent to the lot in dispute, designated by the letters B, C, D, and described as follows:

"Lying and being situated in this [St. Mary] parish, on Bayou Bœuf, as the lower part of the land heretofore owned by Christopher O. Brien, measuring four acres on the old road leading from R. B. Brashear up Bayou Bœuf;

commencing at a corner on R. B. Brashear line at the road, and running north 56° E.. 23 chains and 43 links, along his line to a corner; then, from the beginning corner, south, 70° E., 12 chains and 66 links along a road to a corner; running thence north 23° 21″ E., 18 chains and 98 links, to the corner on said R. B. Brashear line, as presented by a plat made by Wm. Aug, Dep. Surveyor, containing 12 superficial acres."

On September 28, 1855, Olympus Young sold to R. B. Brashear the lot here in dispute by an act reading in part:

"He did, and does, by these presents, bargain, sell, assign, convey, set over and deliver unto Robert B. Brashear all that certain strip of land lying between the lot of land acquired by the present vendor [should be vendee] from America Brien, wife of Alfred Sterns, as per act executed before Thomas A. Smith, a notary public, under date the 3d [should be 23d] March, 1853, and Bayou Bœuf, in this parish; to be bounded, consequently, above, by land of the vendor, in front, by the said bayou, and in the rear and below by land of the vendee, it being a strip of land making part of the plantation acquired by the present vendor from description [Christopher?] Brien, as per act of sale executed before me, said recorder, on the 15th day of January, 1851."

The act was recorded in the conveyance office of the parish of St. Mary on the day of its execution. It will be readily understood that the words "front," "rear," "above," and "below," as used in the description, all refer to the bayou and its course (the course being northwestward), from which, and from other evidence, it appears that the land lying to the southeastward of the lot sold was considered as so far connected with it as to authorize its being called a boundary, the boundary "above" (or up stream), in fact, it is the basis of defendant's position that Young owned the whole of fractional section 11, as designated on the sketch, and that the lot in dispute formed part of it.

On July 18, 1881, the sheriff of the parish of St. Mary, acting under an order of the parish court, made in the successions of Thomas T. and Robert B. Brashear, made a sale of a large proportion of the property of those successions, including a number of town lots, and also the following, to wit:

"All the right, title, and interest of the deceased in and to the ground acquired and used by Morgan's La. & Texas R. R.; the same beginning at the line of the plantation formerly owned by the late Olympus Young, dec'd, and running (through) Railroad street to Berwicks Bay, together with all the right, title, and interest of the deceased in and to all the battures in front of the town of Brashear; said battures commencing at Brashear avenue, on Berwicks Bay, and running down said bay to Bayou Bœuf, to the line of the late Olympus Young."

The deed thus quoted appears to have been recorded in the mortgage office of the parish of St. Mary, but not in the conveyance office. As the subsequent occurrences and conveyances whereby the present plaintiffs acquired the title thus disclosed are not seriously (if at all) disputed, it is unnecessary that they should be particularly recited.

Turning to the title set up by defendant, we find that Olympus Young died at some time prior to 1871, or early in that year, leaving defendant as his widow, with children, issue of the marriage, and three daughters by a previous marriage, to wit, Mary, wife of Abram Eves, and the Misses Eliza and Pauline Young, minors, and leaving also a will to which was added a letter of instruction and request, directed to his executors, and reading in part:

"I wish the children to give to their stepmother * * * 100 acres of land off the end of the plantation next to town, which they promise me they will do."

In fulfillment of that promise, Mary Young (Mrs. Eves), on February 6, 1871, executed an act of conveyance, in the form of a sale, but in reality donation, to defendant of the following described property, to wit:

"One-third of that certain piece or parcel of land lying and being situate in the parish of St. Mary, known, designated, and described as fractional section number eleven, * * * being a portion of the sugar plantation purchased by the present vendor and Olympus Young, natural tutor to his minor children Eliza V. and

Pauline A. Young, at sheriff's sale on the 2d day of July, A. D. 1870; said portion lying next to Brashear City, containing 100 acres, more or less, together with all the buildings and improvements situate thereon."

In a similar act executed by Miss Eliza V. Young (an emancipated minor) on April 25, 1872, the description reads:

"The vendor's one-third interest in and to that certain piece or parcel of land lying and being situated in the parish of St. Mary, known, designated, and described as fractional section number eleven; * * * it being a portion of the sugar plantation purchased by vendor's sutors [tutor] and Mrs. Mary Young, wife of Abram E. Eves, * * * and [said] portions [portion] hereby conveyed adjoined [adjoins] the town of Brashear, and contains 100 acres, more or less, together with the vendor's one-third interest in and to the buildings and improvements situated thereon."

And in a similar act executed by Miss Pauline A. Young (also an emancipated minor) on May 19, 1877, the description reads:

"The vendor's one-third interest in and to that certain piece or parcel of land lying and being situated in the parish of St. Mary, known, designated, and described as fractional section number eleven, * * * less twelve acres sold by Christopher O'Brien to Captain Stern, it being a portion of the sugar plantation purchased by vendor's tutor, representing her and her sister, Eliza V. Young, and by Mrs. Mary E. Young, the wife of Abram E. Eves; * * * said portion hereby conveyed adjoins the town of Brashear, as incorporated March 8, 1860, and contains 100 acres, more or less, together with the vendor's one-third interest in and to the buildings and improvements situated thereon."

One of the contentions of defendant's counsel is that the terms "portion lying next to Brashear City," "and portions [portion] hereby conveyed, adjoined [adjoins] the town of Brashear," and "said portion hereby conveyed adjoins the town of Brashear," as used in the above-quoted conveyances, do not limit the grants to land lying without, but may include the lot in dispute (as part of fractional section 11), though it lie *within* the limits of the town of Brashear.

Another contention is that plaintiffs have failed to establish the limits of the town, and hence has failed to show that the lot in question is within those limits.

Leaving the first for future consideration, we now inquire into the facts disclosed by the evidence as bearing upon the second of those contentions. Defendant offered three plats of survey, identified as "D. A.," "Deft. B," and "Deft. C," concerning which she, her son (Mr. Burns Young), and Mr. W. D. Corbin, witnesses called in her behalf, gave the following testimony, to wit:

"(Defendant:) Q. Examine the map 'D. A.,' and state whether or not that is the original map he [referring to Mr. Gourrier, a surveyor, by whom the map is said to have been made] delivered to you on making the survey? A. Yes; this is the original map I received from him. Q. And that map was colored to identify your property? A. Yes; there is no difference; I most emphatically swear that is the map as I received it; no change has been made."

"(Mr. Burns Young:) Q. You have produced a document which is marked 'D. A.' Will you please state whether that is the original map furnished by Mr. Gourrier, in 1878, the surveyor of whom you spoke? A. Yes; it is. Q. What land on that map—how would you designate the land on that map as the land of your mother? A. All fractional section 11, less 12 acres, sold to Mrs. Stevens, or Mrs. America Brien. Q. How is it tinted on the map? A. It is tinted yellow; the other is not colored, except the water."

"(Mr. Corbin:) Q. Will you please examine the maps marked 'D. A.,' 'Deft. B,' and 'Deft. C,' and state whether or not you made those maps? A. 'Deft. B' and 'D. A.,' are tracings which I made of a map furnished me by Mr. Young; 'Deft. C' is a map I made from measurements taken from the land. Q. Then does this map 'Deft. C' show the land as it now exists upon Bayou Bœuf? A. Yes."

It would appear, therefore, that the Exhibit "D. A.," as offered on the trial, was a tracing made by Mr. Corbin of a plat of survey, or "map," furnished to the witness by Mr. Young, and said to have been made by Mr. Gourrier, at the instance of defendant, in 1878; and, if that view be correct, there must have been some misapprehension on the part of defendant and Mr. Young when they testified that the Exhibt D. A, shown to them, was the identical "map" that had been

delivered by Gourrier. However that may be, Mr. Gourrier not having been called to verify and explain his work (perhaps because he is no longer within reach of such calls), the map stands upon its own merits, and is relied on by defendant as showing that the lot in dispute is represented as part of fractional section 11, and hence as the property of defendant. On the other hand, it is relied on by plaintiff as representing that lot to be within the corporate limits of the town of Brashear, and hence as not within either the terms of Olympus Young's mortuary request to his daughters or their conveyances to defendant in conformity to that request. We may add that the exhibits mentioned are represented in the transcript of appeal by blueprints, and that the space on Exhibit "D. A," referred to by the witness Young as yellow tinted, appears on the print to have been painted "white"; [1] and that we can best otherwise describe the print by reference to the sketch, which we make part of this opinion, the main feature of which is a faithful reproduction, upon a reduced scale, of the land, as shown and subdivided on the print, together with the railroad and canal running through the same, to which we have added some other features, compiled from other prints that we find in the transcript, or expressive of the conclusions reached by us. The space which upon the sketch is occupied by the inscriptions "Town of Brashear," etc., and "Morgan City," etc., upon the blueprint, bears the legend "Section 11; the property of Mrs. M. M. Young, Parish of St. Mary, La., containing 99.71 acres, less R. R. lands, and exclusive of a lot of 12 acres, bought by R. B. Brashear, March 18th, 1853"; with the name of the surveyor and the year (1878) of the survey. The whole of the area designated on the sketch as "Sec. 11," also the lot A, B, C, appear in white on the blueprint, and com-

prises that portion of the Exhibit "D. A" offered on the trial, which is referred to in the testimony as being tinted yellow. The rest of the exhibit, as we find it in the transcript, save the lettering, figures, and lines, is the usual blue of the blueprint.

There is nothing in the evidence to indicate that the 12-acre lot (B, C, D on the sketch) was ever a part of section 11, and nothing, except the Gourrier survey, to indicate that the lot in dispute (A, B, C on the sketch) was ever a part of that section. The original charter of the town of Brashear (now Morgan City), being Act No. 102 of 1860, p. 71, defined its limits as follows:

"Section 1. * * * That the resident citizens of the United States within the following limits, to wit: All that tract or parcel of ground in the parish of St. Mary, beginning at and upon the margin of the east bank of Berwicks Bay, and running thence along and with the north line of Brashear avenue (as at present represented upon the lithographed plat of the town hereby incorporated), to the boundary line of lands belonging to Olympus Young; thence following said boundary line southward to Bayou Bœuf; thence along the shore or margin of Bayou Bœuf to Berwicks Bay, and along the margin of Berwicks Bay to the place of beginning."

In order, therefore, to find the eastern (or southeastern) boundary of the town, as thus established, we have only to follow the western (or northwestern) "boundary line of the land belonging to Olympus Young," as shown on the Exhibit "D. A," and, for the purposes of this case, it is immaterial whether we start at Brashear avenue or lower down, since we are interested only in that part of the line which, according to the sale by Young to Brashear in 1855, marked the boundary between the lot sold to Brashear and the land of which Young remained the owner, and which, together with the rest of the line, became, by the act of 1860, also the boundary of the town of Brashear, separating the town on the one side from the land belonging to Young on the other, and leaving the lot, which Young had sold, within the limits of the town. And it is equally imma-

---

[1] Shown shaded on sketch.

terial whether that lot formed part of fractional section 11 or not (it was not so described in the sale to Brashear), since the boundary of the town was established, not according to the section line, but "according to the [western, or northwestern] boundary line of the land belonging to Olympus Young," which line plainly appears on Exhibit "D. A" as passing between the lot in dispute and the land which was inherited by the daughters of Olympus Young and his first wife, and by them conveyed to the defendant as "next to" and "adjoining" the town of Brashear (or "Brashear City," as it was then generally, though without legal sanction, called).

Upon the question of possession: The act of sale from Young to Brashear declares that the vendor delivers the lot sold to the vendee, and the evidence shows no interference by defendant with the constructive possession conferred by that sale and declaration from that time until the month of October, 1889, or, as we are inclined to think, until March, 1902; the facts being as follows: The council of "Morgan City" (the name given to the town of Brashear by the General Assembly in 1875), assuming the authority as the administrator of the banks of a navigable stream, on October 14, 1889, passed an ordinance, which was followed by a notarial act, granting to the A. Booth Packing Company the use of 600 feet of the batture along the banks of Bayou Bœuf (which included the batture in front of the lot here in dispute), "with the privilege to construct piers, wharves, and warehouses necessary to conduct their business, and to occupy the same, free of all rents and wharf dues or fees, during the existence of (the) this grant"; which grant was made for 10 years, with privilege of renewal, in addition to which the company was exempted from the payment of licenses. The notarial act was signed by the mayor for the town, and by "J. A. Joullian, Manager," for the packing company. Mr. Joul-

lian, having been called as a witness for the defendant, testified that he obtained her verbal permission to establish the packing plant, or cannery, at the place mentioned, and, until his attention was called to the matter on cross-examination, failed to refer to the grant from the town, or to any arrangement that he may have made with the railroad company, part of whose right of way he appears to have occupied. On the cross-examination, counsel for plaintiffs, after referring to the ordinance and notarial act, propounded to him the question, and received answer, as follows:

"Q. Now the town of Morgan City, by this ordinance, granted you the right to occupy this land described in the ordinance, did it not? A. We didn't consider we were to occupy any land. We were told by Mr. Crawford—the railroad representative—that there was a very wide batture, and that we would have to lie out in the stream and have pilings put down, and lie against them, and that was ultimately done for us. Q. Who put the pilings down? A. The Southern Pacific Railroad. * * * Q. Now, then, you say your factory was a floating factory in the water? A. Yes; one was and the other was sunk in the bayou here. Q. The one sunk out here was filled with shells? A. No. Q. Now, the shells, they were all dropped in the water were they not? A. No. Q. The factory was so located, the shells you threw away were dropped in the water? A. No. Q. Where were they dropped? A. They were dropped in cars on the track. Q. What cars? A. The Southern Pacific cars. Q. Those were the shells you sold? A. We didn't sell any shells. Q. Well, the shells you gave away, some might have dropped overboard? A. Some few; yes. Q. Did you haul any shells up to this land and fill it? A. From the factory that was sunk; yes."

From all of which it appears that the packing company located where it did rather through permission from the town, formally accepted by notarial act, and from the railroad company, to which it seems to have paid tribute in the way of shells, than from defendant.

It received the grant from the town on October 28, 1889, and abandoned the place in January, 1891, having occupied it about 14 months; and from that time until March,

1902, we find no shadow of actual possession by defendant, who, though she testifies that she went into possession immediately upon the execution of the conveyances by her stepdaughters, and in fact was in possession prior to that time, also testifies that she has passed the lot in dispute, but has never visited it.

In March, 1902, the property was leased by defendant, through her son and agent, for 10 years, with privilege of renewal, to C. & W. Hanson, for the purposes of a shingle mill; and at the end of 10 years C. & W. Hanson were succeeded by another tenant engaged in the same business. The lease to the Hansons called for a rental of $180 a year for the first two years, and $240 a year thereafter, and the gross amount of rent actually collected up to the institution of this suit was $1,728. Mr. Young testifies that he was at some expense for attorney's fees in making the collections, and estimates the net amount collected at about $1,000. It is shown that the shingle men disposed of their sawdust by throwing it in the water, or on the batture, but we do not find that defendant gave them any consideration therefor, or that they could, conveniently or profitably, have made any other disposition of it. There is testimony tending to show that the filling has enhanced the value of the property to the extent of $3,000 (the amount claimed by defendant in reconvention); but there is also testimony to the effect that, as a foundation for buildings, sawdust is worthless. By act No. 99, approved April 27, 1871, the town of Brashear was granted a new charter whereby its eastern boundary was so delimited as to include the whole of section 11.

By an act passed in 1875 (Acts 1876, No. 7) the name of the place (as we have stated) was changed to Morgan City. This suit was instituted on April 12, 1910. There was judgment in the trial court in favor of defendant, and plaintiffs have appealed.

## Opinion.

[1, 2] That Olympus Young sold the lot here claimed to plaintiffs' author in title, in 1855, is indisputable; and it is equally beyond dispute, as it appears to us, that as the western boundary of Young's property at that point was thereby established as boundary between the lot sold and the property retained by him, and the General Assembly thereafter declared that his western boundary should constitute the eastern boundary of the town of Brashear, the lot thereby became part of the town, and the property retained became property "next to" or "adjoining" the town. Since, therefore, in the letter written upon the same paper as his olographic will, and apparently bearing the same date (March 21, 1870), Young expressed the wish that his children should give their stepmother "100 acres of land off the end of the plantation next to the town, which they promise me they will do," it cannot for an instant be believed that he expected his children to include the lot here in question in their gift; first, because he knew that he had sold it to Brashear, and that it would not be theirs to give; and, last, because, his boundary having also been the boundary of the town for 20 years, he must be presumed to have known that the lot was within the town limits, and he expressed the wish that his children should give "100 acres off the plantation" (not within the town limits, or remote from the town, but) "next to the town." And so it may be said in reference to his daughters, who were thus charged to give effect to the last wishes of their father. They had lived, as we infer, for the greater part, if not all, of their lives within a few hundred yards from the line which constituted the boundary between their father's land (meaning so much of section 11 as had not been included within the town) and the town of Brashear, and may reasonably be supposed to have known the location of that line, and the extent of

their father's holdings in such close proximity to the house in which they lived, and to have acted intelligently when, in the instruments executed by them, they described the land, their respective one-third interests in which they conveyed to defendant, as "portion lying next to Brashear City, containing 100 acres, more or less," "portion here conveyed adjoins the town of Brashear, as incorporated March 8, 1860, and contains 100 acres, more or less," etc.

Counsel for defendant argue that the words, "portion lying next to Brashear City," etc., were intended as descriptive of the general location of the land, but are controlled by the previous call, both as to location and acreage. Thus, they say, in effect, that "one-third of that * * * parcel of land lying * * * in the parish of St. Mary, known * * * as fractional section 11, * * * being a portion of the sugar plantation, * * * said portion lying next to Brashear City, containing 100 acres, more or less," means that the grantor conveys one-third of fractional section 11, and takes the full 100 acres, though they are not all to be found in the parish, section, or plantation mentioned, but as to a few acres, required to fill up the number, must be sought within the limits of, and not "next to," the town. We are unable to concur in that view. We will not presume that Olympus Young intended to ask his daughters to convey to their stepmother, after his death, property of which they were not to become the owners, or that they intended, in complying with that request, to convey property that did not belong to them, and was not, and could not have been, within the meaning of the request. Apart from that, it would be unusual, to say the least of it, to include in a sale of 100 acres of land, more or less, described as lying "next to a town," a parcel of land within the town limits, and make no mention of it. Again, the words "more

or less," used in that connection, mean that the exact acreage called for may not be found, and provide against that contingency that the grantee shall take less, if the difference be small; and in this instance, as the lot in question is said to have then contained but 1.7 acres, the difference was small. We may add that, though the Exhibit "D. A" calls for but 99.71 acres, "less R. R. lands," we infer that by the devolution of those lands, in consequence of the removal of the railroad to another location or otherwise, defendant has really come into possession of more than 100 acres.

We have thus considered the question whether the descriptions in the deeds relied on by defendant could fairly be interpreted to include the property here claimed, not that a perfect description of that property could defeat plaintiffs' right of recovery upon the case presented (since they, and not defendant's grantors, were the owners of the property said to have been conveyed by those deeds), but because of its possible bearing upon the question of defendant's good or bad faith in the matter, and of the bearing of that question upon others, which are now to be considered.

[3-5] Defendant pleads the prescriptions of 10 and 30 years, acquirendi causa.

In order to acquire real property by the prescription of 10 years one must have actually possessed it during that period, in the capacity of owner, under a title such as, if otherwise valid, would, by its terms, transfer the ownership, and which he had received from a person whom he honestly believed to be the owner; and the possession must have been continuous and uninterrupted, peaceable, public, and unequivocal. Civ. Code, arts. 3478, 3483, 3484, 3486.

Defendant has not shown either the title, the possession, or the good faith required. The title exhibited by her, in our opinion, is not such as would transfer the property; the

possession was not held, therefore, under a just title; nor was it continuous and uninterrupted during the required period; and, the title having been bad on its face, defendant does not come within the definition of a possessor in good faith. C. C. arts. 503, 3451.

The only possession that she has established was that which began with the lease to C. & W. Hanson, in 1902, and which was interrupted by the institution of this suit, in 1910—a circumstance which disposes also of the plea of the prescription of 30 years. C. C. arts. 3500, 3503, 3505. Not having been a possessor in good faith, she is liable for the rents and revenues of the property during the period of her possession. C. C. art. 502. And she could not, under such circumstances, recover the enhanced value of the property resulting from any works that she may have put on it, though she would, under some circumstances, be entitled to recover the cost of labor and material expended by her on such works, "without any regard to the greater or less value which the soil may have acquired thereby." C. C. art. 508. But she has not here sued for such recovery; nor do we think she would be entitled to recover had she done so. The works which she alleges have enhanced the value of the property consisted of the filling of the batture with sawdust from the shingle mill. It cost her nothing, and the evidence fails to satisfy us that the millowners could otherwise, conveniently or profitably, have disposed of their sawdust. Whether it has really enhanced the value of the property is a question about which there is some difference of opinion among the witnesses, and which may depend upon the uses to which the property is to be devoted in the future.

[6, 7] The evidence fails to show the payment by defendant of any taxes on the property. She was assessed for the years 1875–76 (which was after the whole of section 11 had been included, by the act of 1871, within the town limits) upon 95 acres of land adjoining Brashear City, not laid off in town lots, and for a number of subsequent years upon "95 acres" in Morgan City. As the property here in question did not stand in her name in the conveyance office, we find no reason to suppose that it was included in any of those assessments.

It is not shown that any of the taxes so assessed were actually paid.

It was admitted by defendant's agent that the whole amount of the rent due by the Hansons, up to the institution of this suit, had been collected. His statement that he was subjected to some expense in the way of attorney's fees in making the collection, and that the net amount collected was $1,000, or about $1,000, appeared to be a mere guess, and we doubt its correctness; $728 of attorney's fees for the collection of $1,728 of rent from a tenant operating a shingle mill, with machinery on the premises subject to the lessor's privilege, appears hardly within the bounds of probability. Having admitted the collection, the agent should have proved the offset (if defendant was entitled to any, a point about which we express no opinion), as he alone possessed the necessary information.

It seems hardly necessary to add that, as defendant acquired no title to the lot in dispute, she acquired none to the batture in front of the lot, and hence that the fact that the sale of the batture to Walter B. Lawrence was recorded in the mortgage instead of the conveyance office is one in which she has no interest.

For the reasons thus assigned, it is ordered and adjudged that the judgment appealed from be annulled, and that there now be judgment in favor of the plaintiffs, decreeing them to be the sole owners of the property here claimed by them, and entitled to immediate possession of the same, and decreeing defendant to be without title thereto or right of possession. It is further de-

creed that plaintiffs have judgment against defendant in the sum of $1,728 as for rents collected from said property prior and up to the institution of this suit, with legal interest thereon from judicial demand, and that the demand in reconvention set up by defendant be rejected. It is further decreed that defendant pay all costs.

O'NIELL, J., being recused, takes no part.

### On Rehearing.

SOMMERVILLE, J. The former opinion and decree in this case are reinstated, and they are made the opinion and decree of the court.

O'NIELL, J., was recused in this case.

PROVOSTY, J., absent on account of illness, takes no part.